*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* K. ENGLISH, Minor.

UNPUBLISHED
January 20, 2022

No. 357499
Crawford Circuit Court
Family Division
LC No. 18-004468-NA

Before: O'BRIEN, P.J., and STEPHENS and LETICA, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court's order terminating her parental rights to the minor child pursuant to MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), and MCL 712A.19b(3)(j) (reasonable likelihood of harm if returned to parent). We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

In late August 2018, the police received a report of drug use in an apartment where the minor child, four-year old KE, resided. The police found respondent and KE in her apartment. Respondent had redness and scratch marks on her neck purportedly from an assault by the child's father.[1] Specifically, she reported that the trio where at a park when the father placed her in a chokehold. He released respondent after the child screamed. Respondent then pushed the father into the river.

The child was not questioned by the police, but was seated nearby in the small apartment during respondent's interview. He stated that his daddy pushed and hit mommy. Drugs were not in plain view in the apartment, but respondent was arrested for an outstanding child support warrant. Petitioner, the Department of Health and Human Services (DHHS), removed the child from respondent's custody and placed him in nonrelative foster care. This was the child's second

---

[1] The father's parental rights to KE were also terminated, but he stipulated to the dismissal of his appeal. *In re K English Minor*, unpublished order of the Court of Appeals, entered September 8, 2021 (Docket No. 357556).

removal from the parents. He was previously removed from the parents for 13 months because of domestic violence and substance abuse, but returned to respondent's custody in June 2018. Although the child was previously placed with his paternal uncle and aunt for the prior 13-month removal, DHHS did not approve this placement because of inappropriate and threatening communications including social media posts, favorable treatment given to the father at respondent's expense, and the aunt and uncle's conveyance of confidential information to the father. At the time of the child's removal, respondent was given a drug screen which tested positive for amphetamines, methamphetamines, cocaine, and hydrocodone.

In an attempt to reunify the child with respondent, the caseworker provided services to respondent that included domestic violence counseling, housing resources, parenting time support services, foster care supportive visitation, transportation, parenting time, substance abuse drug screens, inpatient and substance abuse counseling, and psychological evaluations. Respondent was asked to give nearly 190 drug screens, but did not complete approximately 150 screenings. Additionally, respondent tested positive for a range of substances including amphetamines, methamphetamines, fentanyl, cocaine, benzodiazepines, alprazolam, hydrocodone, and THC. In early August 2020, respondent provided a drug screen at a court hearing; it was positive for methamphetamine, resulting in suspension of respondent's parenting time. Approximately three weeks later, both respondent and the father overdosed together. Respondent was apprised that she needed to demonstrate 30-days of sobriety to resume visitation, but she did not meet this standard.

The caseworker was aware that respondent's impediments to regaining custody of the child included sobriety, transportation, housing, and domestic violence counseling. Although respondent attended two inpatient treatment programs, she did not successfully complete them. The caseworker was advised that respondent was dismissed from the programs by engaging in inappropriate sexual contact, returning to a facility with a cell phone, and drug use. The caseworker repeatedly tried to use the River House program for housing because of its success rate, but respondent failed to participate. The caseworker knew that respondent had transportation issues and delineated when she drove respondent to various appointments or services. Further, respondent was given bus passes for public transportation, but it was difficult to assist her when she moved to counties downstate, including Oakland and Macomb. Although respondent did not have a working phone at one point, the caseworker had six different phone numbers to reach respondent.

Respondent was diagnosed with avoidant personality disorder. To address this condition, it was recommended that respondent participate in individual therapy, and improvement was generally observed within six months. Consequently, at the court's suggestion, DHHS withdrew its petition to terminate respondent's parental rights to allow her additional time to regain custody of the child. However, respondent then moved to different locations. Although DHHS filed the petition in Crawford County, respondent moved between Crawford, Oakland, and Macomb counties. These moves impeded DHHS's ability to provide services. Indeed, respondent was unable to refill a prescription because of her frequent moves. Additionally, respondent's failure to establish residency prevented the local agencies from providing services. Ultimately, respondent rented a room in a friend's trailer in Macomb County. However, she declined to permit an agency review of the home citing a lack of ownership in the premises. The caseworker also believed that respondent did not benefit from domestic violence counseling because she seemingly

continued to have a relationship with the child's father. Respondent overdosed with the father in August 2020, and was arrested at his home on another occasion.

Initially, the child was bonded to respondent and was excited to see her at visitation. The child was prone to aggression which caused DHHS to move him into four different foster care placements. However, in his most recent foster care home, the child was doing extremely well in his placement. He had recently reduced his feelings to words instead of acts of aggression. Additionally, at the time of respondent's termination hearing in May 2021, the child had not asked about respondent since December 2020, or sought to provide her with his artwork. The caseworker recommended termination of respondent's parental rights because of the inability to determine whether respondent had benefited from services, the lack of participation, and the child's need for stability and permanence.

Respondent, on the other hand, testified that she tried her hardest and needed more time despite the 32 months that the child had been in care. Rather, she faulted DHHS for failing to provide practical transportation, failing to obtain housing, failing to bring the drugs screens to her, and failing to maintain communication. She claimed to apprise her caseworker that inpatient treatment would not work because of respondent's conflicts with others. When pressed regarding positive drug screens and the August 2020 drug overdose, respondent refused to answer those questions. Additionally, respondent testified that the child's removal was unwarranted and asserted that the number of foster care placements demonstrated that the child would have been better with her. Respondent claimed that she benefited from counseling and classes that she did attend. She denied a continued relationship with the child's father and explained any contacts with him as co-parenting. She further alleged that the child's father allowed her to store her belongings at his home.

The trial court found that the statutory grounds for termination were established by clear and convincing evidence and that termination of her parental rights was in the child's best interests. The trial court concluded that respondent failed to address her mental health issues and her sobriety. With regard to mental health services, the trial court found that respondent's *choice* to move to three different counties prevented any substantive therapy from occurring for 18 months. Thus, the trial court identified this as "noncompliance on her part" and did not fault DHHS for the services offered. The trial court found the caseworker's testimony was credible regarding the missed drug screens, positive drug screens, and the removal from inpatient treatment programs for improprieties. Although respondent claimed there was a failure or inability to conduct drug tests on the part of DHHS, the trial court concluded that respondent deliberately did not participate to prevent DHHS from acquiring adverse information. Addressing housing, the trial court noted that respondent had been referred to River House on 50 occasions because of its success rate, but respondent did not cooperate. The trial court found that DHHS offered services and tried to help, but respondent could not be forced to participate, and she did not engage.

After concluding that the statutory grounds for termination were established by clear and convincing evidence, the trial court found that there was a bond between respondent and the child. But that bond "eroded" because visitation between the two had not occurred for almost a year due to respondent's drug use. Although the trial court found that respondent wanted to be a good parent, it concluded that she did not have the ability because she failed to treat her mental health and substance abuse issues. The continued drug use and recent overdose precluded her from

guiding and providing for the child. The trial court expressly concluded that DHHS had fulfilled its responsibilities to provide services and tried to engage respondent, but she presented "barriers and explanations" for her noncompliance. Further, it would be unfair to the child to afford respondent additional time to comply when it would not yield a positive result.[2] Finally, the trial court denied the father's motion to place the child with his paternal uncle and aunt. The trial court found that the couple was not forthright regarding drug use by the parents, at the expense of the child, and acted inappropriately. It also credited the testimony proffered by the child's therapist that the child expressed love for his current foster care placement and removal from this family would be detrimental. Finally, the trial court noted that the termination of parental rights and placement for adoption afforded the paternal uncle and aunt the opportunity to adopt the child. Respondent now appeals the termination of her parental rights.

## II. REASONABLE EFFORTS AT REUNIFICATION

Respondent first alleges that DHHS failed to make reasonable efforts to reunify her with the child. We disagree.

Generally, reasonable efforts to reunify the child and family must be made in all cases. MCL 712A.19a(2); *In re Rippy*, 330 Mich App 350, 355; 948 NW2d 131 (2019). However, while DHHS "has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). "Not only must [a] respondent cooperate and participate in the services, she must benefit from them." *In re TK*, 306 Mich App 698, 711; 859 NW2d 208 (2014). We review for clear error a trial court's decision regarding agency efforts to reunify and preserve the family. *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005).

Respondent raised this claim of DHHS deficiencies below, and it was rejected. Rather, the trial court found that petitioner made reasonable efforts to reunify respondent with her child, but that respondent failed to fully participate in and benefit from the services offered. We cannot conclude that the trial court clearly erred in light of the testimony presented by the caseworker. The primary issues in the case were respondent's substance abuse, mental health, and housing. The caseworker testified that she and others made referrals to the River House shelter more than 50 times to address housing. She even offered to help respondent call for an intake appointment and to transport respondent to the facility, but respondent did not take advantage of these offers. Respondent also received two psychological evaluations and referrals. Indeed, the petition requesting termination of respondent's parental rights was withdrawn to allow respondent to address her avoidant personality disorder. However, respondent chose to move downstate which hindered her ability to address this issue. The caseworker further testified that respondent was

---

[2] Respondent also faulted DHHS for the child's placement in multiple foster homes. However, when ruling on the termination of the father's parental rights, the trial court expressly concluded that DHHS was not responsible for the multiple placements. Rather, the trial court noted that the child was moved for aggressive behaviors. Indeed, at the age of six, the child punched a two-year-old in the stomach. The trial court also explained that the child had witnessed domestic violence committed by his father and was at risk for perpetrating violent acts as an adult.

provided with parenting time support services, case-management services, parenting time, and substance abuse treatment, including two inpatient treatment programs and drug screening.

With respect to transportation assistance, the caseworker drove respondent to both inpatient treatment facilities and had provided or arranged for transportation on numerous other occasions. Respondent acknowledged that she had received bus passes, but she did not find them to be particularly useful. The caseworker testified that DHHS could not refer respondent to community mental health (CMH), but respondent was advised that she should enroll. Respondent was also offered substance abuse counseling in the inpatient programs. After respondent was able to enroll with CMH, her counselor referred respondent to talk therapy, eye-movement desensitization reprocessing therapy, and cognitive behavioral therapy.

On appeal, respondent submits that after DHHS finally provided the appropriate mental health services, she lacked the basic foundational needs of housing and transportation. Again, the caseworker testified that it referred respondent to the necessary psychological services, but respondent chose to move downstate. Additionally, respondent moved in between three counties, which included Oakland and Macomb. Because respondent failed to establish residency and frequently moved, local agencies were unable to assist her with the provision of services. Although respondent testified that she ultimately moved to a trailer in Macomb County, she refused to permit a review of the home, citing her lack of an ownership interest. In light of these facts and circumstances, the trial court did not clearly err in finding that petitioner made reasonable efforts to provide respondent with reunification services and reunite her with her child.

## III. BEST INTERESTS

Respondent contends that the trial court erred by finding that termination of her parental rights was in the child's best interests in light of the bond that she shared with the child, her move from her domestic abuser, and the request that the child be cared for by family members instead of the foster care placement. We disagree.

After a statutory ground for termination has been established,[3] the trial court must find that termination is in the child's best interests before it can terminate parental rights. *In re Rippy*, 330 Mich App at 360. We review for clear error a trial court's finding that termination of parental rights is in a child's best interests. *Id*. When applying this standard, "regard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989); see also MCR 2.613(C).

Whether termination of parental rights is in a child's best interests must be proved by a preponderance of the evidence. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). Factors

---

[3] Respondent does not dispute that the statutory grounds for termination of parental rights were established. For purposes of completeness, we note that the record evidence satisfied both MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), and MCL 712A.19b(3)(j) (reasonable likelihood of harm if returned to parent). Indeed, despite the services provided, respondent failed to address the issues of substance abuse, domestic violence, and mental health that led to the child's removal.

to be considered include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (citations omitted). A court may also consider whether it is likely "that the child could be returned to her parents' home within the foreseeable future, if at all." *In re Frey*, 297 Mich App at 248-249.

Although the child initially shared a bond with respondent, respondent's visits with the child were terminated because of a positive drug test. Within three weeks of the termination of the visits, respondent and the child's father overdosed together in August 2020. Respondent was advised that the visits would resume if respondent established 30-days of sobriety. But she failed to satisfy this condition. Because of the lack of visits, the child stopped asking about respondent and expressed love for his foster care family. Indeed, the visits with the child ended in August 2020, the child stopped asking about respondent in December 2020, and her parental rights were terminated in May 2021. In light of this "eroded" bond, the trial court found that termination of respondent's parental rights was in the child's best interests.

To her credit, respondent did move away from her domestic abuser, the child's father. She also testified that she recently obtained housing in a room in a trailer owned by a friend. But respondent did not allow the home to be evaluated for suitability for the child. Additionally, her repeated moves to different counties did not allow her to address her substance abuse and mental health issues. In the end, despite the services offered, respondent's ability to provide care and custody for the child did not improve.

And, contrary to respondent's assertion, the trial court did not find that the child's placement in different foster homes was the fault of DHHS. Rather, the trial court expressly found that the child's movement in foster care was the product of his aggression issues, citing the child's incident of punching a two-year-old in the stomach. Recently, however, the child's behavior improved in his newest foster care placement; he expressed love for the family and addressed his feelings through words and not violence. Additionally, there were repeated requests to place the child with his paternal uncle and aunt, particularly in light of their prior care for the child during an earlier 13-month placement. The trial court initially declined this request, citing inappropriate social media posts, favoritism toward the child's father, and disclosure of confidential information. The trial court declined a later request for relative placement, finding that the couple was not forthright with the court, that they enabled or protected the father to the detriment of the needs of the child, and that their family exhibited dysfunction. Further, the trial court noted that family members could pursue custody of the child by petitioning the adoption superintendent. In light of the record evidence, the trial court did not clearly err by finding that termination of respondent's parental rights was in the child's best interests.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Cynthia Diane Stephens
/s/ Anica Letica